IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO JOHN DINEEN LODGE #7, JOSEPH CAPPELLO, ERIC DURON, VINCENT BARNER, TERRANCE NALLS, GEORGE SPACEK, DIMAR VASQUEZ, JAIME ACOSTA, and LUKASZ GORSKI, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | NO. 24 C 7376 |
| ANDREA KERSTEN, individually and in her official capacity, SHARDAY JACKSON, individually and in her official capacity, MATTHEW HAYNAM, individually and in his official capacity, ANGELA HEARTS-GLASS, individually and in her official city, STEPHANIE HRENO, individually and in her official capacity, CIVILIAN OFFICE OF POLICE ACCOUNTABILITY, a municipal agency, CHICAGO POLICE DEPARTMENT, a municipal agency, CITY OF CHICAGO, a municipal corporation, and LARRY B. SNELLING, in his official capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) | JUDGE |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs, Chicago John Dineen Lodge #7 ("Lodge"), and Officers Joseph Cappello ("Officer Cappello"), Eric Duron ("Officer Duron"), Vincent Barner ("Officer Barner"), Terrance Nalls ("Officer Nalls"), George Spacek ("Officer Spacek"), Dimar Vasquez ("Officer Vasquez"), Jaime Acosta ("Officer Acosta"), and Lukasz Gorski ("Officer Gorski")(collectively referred to as "Plaintiffs") bring this action pursuant to the federal and state laws against Andrea Kersten ("Kersten"), Sharday Jackson ("Jackson"), Matthew Haynam ("Haynam"), Angela Hearts-Glass ("Hearts-Glass"), Stephanie Hreno ("Hreno"), the Civilian Office of Police Accountability ("COPA"), the Chicago Police Department (the "Department"), the City of Chicago (the "City"), and Larry B. Snelling ("Superintendent") (collectively referred to as "Defendants"); and state the following in support of this Complaint:

## I.  NATURE OF THE ACTION

1.  Plaintiffs bring this action pursuant to 42 U.S. Code § 1983 alleging federal civil rights violations under the Fourteenth Amendment of the United States Constitution for the Defendants' individual and collective unlawful violations under color of state law of Plaintiffs' individual and collective Constitutional rights not to be deprived of their life, liberty, or property without due process of law.

2.  Plaintiffs further allege a tort of false light under Illinois common law for Defendants' violations of Plaintiffs' rights not to be presented in a false light to the public in an objectively offensive manner.

3.  Plaintiffs allege that Defendants conducted untimely, biased, and unfair investigations that Defendants used to uphold excessive disciplinary recommendations which violate the above-mentioned federal and state laws and further published the results of such investigations to the detriment of the Plaintiffs.

## II.  JURISDICTION AND VENUE

4.  Jurisdiction is provided by 28 U.S.C. §1983, as this matter alleges that Plaintiffs have been deprived of rights guaranteed to them under the Fourteenth Amendment to the Constitution of the United States of America. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the state law claim in Count III in that the claim is so related to the claim in the action within such original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

5.  This action properly lies in this District pursuant to 28 U.S.C. § 1391(a) because the events giving rise to this claim occurred in this Judicial District and all parties reside in this District.

### III. PARTIES

#### A. **Plaintiffs**

6.     Plaintiff Lodge is a non-profit labor organization within the meaning of §315/3(i) of the Illinois Public Labor Relations Act, 5 ILCS 315 *et seq*., and is the exclusive representative for collective bargaining purposes for bargaining unit employees of Defendant Chicago Police Department. Plaintiff Lodge's bargaining unit is comprised of approximately 12,000 members. As the exclusive representative, Plaintiff Lodge defends members whom Defendant COPA accuses of engaging in misconduct and whom Defendants City of Chicago, Chicago Police Department and Superintendent Snelling punish for allegedly engaging in such misconduct.

7.     The individually named Plaintiff Officers are citizens of the State of Illinois, residents of the City of Chicago, and, at all relevant times, employees of Defendant City of Chicago and Defendant Chicago Police Department.

8.     Plaintiff Officers are also covered by a collective bargaining agreement ("Agreement" or "CBA") between Plaintiff Lodge and Defendant City of Chicago. The CBA has an effective date of July 1, 2014 through June 30, 2017 which establishes their wages, hours and terms of conditions of employment. Although the Agreement has an expiration date of June 30, 2017, by the terms of the Agreement and state law, the Agreement remained in full force and effect until a successor Agreement is finalized.  On September 14, 2021, Defendant City of Chicago ratified phase 1 of the successor Agreement.  On December 14, 2023, Defendant City of Chicago ratified the remaining terms of the successor Agreement.[1]

---

[1] There is currently pending litigation in the Illinois Appellate Court related to certain terms of the successor Agreement, the outcome of which is not relevant to this litigation.

9.      For each of the hereafter individually named Officer Plaintiffs, the Lodge expended resources on attorneys' fees and arbitration costs as a result of Defendants' actions as alleged herein.

10.     Article 8 of the CBA states, "No Officer covered by this Agreement shall be suspended, relieved from duty or otherwise disciplined in any manner without just cause." Article 9 sets forth a grievance procedure whereby the Lodge may challenge discipline by the Department upon Officers, including submitting the matter to arbitration for a final and binding determination.

11.     <u>Officer Joseph Cappello</u>: Officer Cappello began his employment with Defendant Chicago Police Department on October 27, 2014. Officer Cappello has spent his career as a tactical officer. His excellent work history included 146 awards at the time of Defendant COPA's investigation.

12.     <u>Officer Eric Duron</u>: Officer Duron began his employment with Defendant Chicago Police Department on May 1, 2023. Officer Duron has spent his career as a tactical officer. His fine work history included  63 awards at the time of Defendant COPA's investigation.

13.     <u>Officer Vincent Barner</u>:  Officer Barner began his employment with Defendant Chicago Police Department on December 4, 1995. Officer Barner has spent his career as a Patrol Officer. His terrific work history included 45 awards at the time of Defendant COPA's investigation, including the Superintendent's Award of Valor.

14.     <u>Officer Terrance Nalls</u>: Officer Nalls began his employment with Defendant Chicago Police Department on December 5, 1994. Officer Nalls has spent his career as a tactical officer and a detective.   His superb work history included 161 awards at the time of COPA's investigation.

15.    <u>Officer George Spacek</u>: Officer Spacek began his employment with Defendant Chicago Police Department on August 27, 2001. Officer Spacek has spent most of his career as a tactical officer. He has an exceptional work history that includes 207 awards at the time of Defendant COPA's investigation.

16.    <u>Officer Dimar Vasquez</u>: Officer Vasquez began his employment with Defendant Chicago Police Department on February 23, 2015. Officer Vasquez has spent his career as a tactical officer. He has a superior work history that included 85 awards at the time of Defendant COPA's investigation.

17.    <u>Officer Jaime Acosta</u>: Officer Acosta began his employment with Defendant Chicago Police Department in December, 2015. Officer Acosta has spent his career as a Tactical Officer. He has a solid work history that includes approximately 200 awards at the time of Defendant COPA's investigation.

18.    <u>Officer Lucasz Gorski</u>: Officer Gorski began his employment with Defendant Chicago Police Department on February 19, 2013. Officer Gorski has spent his career as a tactical officer. He has a superb work history that included 141 awards at the time of Defendant COPA's investigation.

### B.    <u>Defendants</u>

19.    Defendant City of Chicago is an Illinois municipal corporation located in Cook County, Illinois. Defendant City of Chicago is a "person" for purposes of enforcement of the rights guaranteed under 42 U.S.C. §1983. Defendant City of Chicago is the employer and principal of the individual defendant actors.

20. Defendant City of Chicago maintains a police department, the Chicago Police Department, and employs Police Officers who, among other things, are responsible for enforcing laws and protecting individuals in the City of Chicago.

21. Defendant Chicago Police Department currently has a Police Board (the "Board") which is comprised of nine (9) members appointed by the Mayor of the City of Chicago with the advice and consent of the City Council.

22. Defendant Chicago Police Department is an executive department and a municipal government agency of Defendant City of Chicago and is the employer of the Plaintiff Officers.

23. Defendant Chicago Police Department consists of Police Officers, Sergeants, Lieutenants, Captains, and other personnel. Defendant Chicago Police Department currently employs a Superintendent of Police, who is the chief executive officer of Defendant Chicago Police Department and is appointed by the Mayor upon the Board's recommendation, and with the city council's advice and consent. The Superintendent has the power to take disciplinary action against employees of the Department.

24. Mayor Brandon Johnson appointed Defendant Superintendent Larry B. Snelling as the Superintendent of Defendant Chicago Police Department on August 13, 2023. Defendant Larry B. Snelling (hereinafter referred to as "Superintendent") is currently the Superintendent of the Chicago Police Department at or after the time prior Superintendents served the Plaintiff Officers with discipline and, currently, a superior to Plaintiff Officers employed by the Department acting under the color of law with decision-making authority over them. Defendant Snelling is sued in his official capacity. Predecessor Superintendents, including David Brown and Eric Carter, evaluated the underlying investigations and subsequently disciplined all of Plaintiff Officers. For the purpose of this litigation, Defendant Superintendent Snelling will be named as the Defendant

Superintendent and will represent all former Superintendents (hereinafter referred to as "Superintendents").

25.     Defendant City of Chicago at all times relevant hereto, employed Defendant Superintendent and other Superintendents and is responsible for the acts of Defendant Superintendents, and other Superintendents who acted within the scope of their employment and pursuant to a custom, policy, or practice of violating Plaintiffs' rights to due process under the Fourteenth Amendment to the Constitution of the United States.

26.     Defendant City of Chicago maintains an agency, the Civilian Office of Police Accountability ("COPA"), and employs individuals who, among other things, are responsible for conducting investigations into allegations of Chicago Police Officer misconduct.

27.     Defendant COPA consists of a chief administrator, deputies, assistants, and other employees. Defendant COPA is the employer of Defendant Kersten.

28.     Defendant Andrea Kersten (hereinafter referred to as "Chief Administrator Kersten") was at all relevant times hereto an employee of Defendant COPA and acting under the color of state law.

29.     Defendant Kersten implemented and approved certain customs and practices, and had final or delegated final policy-making authority for Defendant COPA. Further, Defendant Chief Administrator Kersten has final approval of all investigations and disciplinary recommendations for Officers employed by Defendant Chicago Police Department, including as they applied to Plaintiffs. Defendant Chief Administrator Kersten is sued in her official and individual capacities.

30.     Defendant Chief Administrator Kersten's actions, as alleged within this Complaint, were the direct and proximate result of the known, pervasive and unconstitutional custom, practice

and policy of Defendant City of Chicago and Defendant COPA to violate the rights of the citizens of the City of Chicago and the State of Illinois with impunity and without fear of official consequences and that her ongoing conduct will go unchecked or unpunished by the Defendant City of Chicago or Defendant COPA.

31.    Defendant Sharday Jackson is employed by Defendant COPA as a Deputy Chief Administrator ("DCA"). As a DCA, Defendant Jackson supervises investigations including reviewing, revising and preparing final reports of Defendant COPA's findings and recommended discipline of Chicago Police Officers including several of the named Plaintiffs.

32.    Defendant DCA Jackson's actions, as alleged within this Complaint, were the direct and proximate result of the pervasive and unconstitutional custom, practice and policy of Defendant City of Chicago and Defendant COPA to violate the rights of the citizens of the City of Chicago and the State of Illinois with impunity and without fear of official consequences and that her ongoing conduct will go unchecked or unpunished by the Defendant City of Chicago or Defendant COPA.

33.    Defendant Matthew Haynam similarly is employed by Defendant COPA as a Deputy Chief Administrator ("DCA"). As a DCA, Defendant Haynam also supervises investigations including reviewing, revising and preparing final reports of COPA's findings and recommended discipline of Chicago Police Officers including several of the named Plaintiffs.

34.    Defendant DCA Haynam's actions, as alleged within this Complaint, were the direct and proximate result of the pervasive and unconstitutional custom, practice and policy of Defendant City of Chicago and Defendant COPA to violate the rights of the citizens of the City of Chicago and the State of Illinois with impunity and without fear of official consequences and that

his ongoing conduct will go unchecked or unpunished by the Defendant City of Chicago or Defendant COPA.

35.    Defendant Angela Hearts-Glass likewise is employed by Defendant COPA as a Deputy Chief Administrator ("DCA"). As a DCA, Defendant Hearts-Glass also supervises investigations including reviewing, revising and preparing final reports of COPA's findings and recommended discipline of Chicago Police Officers including several of the named Plaintiffs.

36.    Defendant DCA Hearts-Glass' actions, as alleged within this Complaint, were the direct and proximate result of the pervasive and unconstitutional custom, practice and policy of Defendant City of Chicago and Defendant COPA to violate the rights of the citizens of the City of Chicago and the State of Illinois with impunity and without fear of official consequences and that her continued conduct will go uncheck or unpunished by the Defendant City of Chicago or Defendant COPA.

37.    Defendant Stephanie Hreno similarly is employed by Defendant COPA as the Director of Investigations ("DI"). As the DI, Defendant Hreno also supervises investigations including reviewing, revising and preparing final reports of COPA's findings and recommended discipline of Chicago Police Officers including several of the named Plaintiffs.

38.    Defendant DI Hreno's actions, as alleged within this Complaint, were the direct and proximate result of the pervasive and unconstitutional custom, practice and policy of Defendant City of Chicago and Defendant COPA to violate the rights of the citizens of the City of Chicago and the State of Illinois with impunity and without fear of official consequences and that her ongoing conduct will go unchecked or unpunished by the Defendant City of Chicago or Defendant COPA.

39. Defendant City of Chicago, at all times relevant hereto, employed Defendants Chief Administrator Kersten, DCA Jackson, DCA Haynam, DCA Hearts-Glass, and DI Hreno and is responsible for their acts pursuant to a custom, policy, or practice of violating Plaintiffs' rights to due process under the Fourteenth Amendment to the Constitution of the United States.

40. Defendant City of Chicago, at all times relevant hereto, employed Defendant Superintendents, and is responsible for their acts pursuant to a custom, policy, or practice of violating Plaintiffs' rights to due process under the Fourteenth Amendment to the Constitution of the United States.

41. Pursuant to the Chicago Municipal Code, Defendant COPA's purpose is to conduct fair and timely investigations involving alleged police misconduct and to determine whether those allegations are well-founded by applying a preponderance of the evidence standard. Chapter 2-78 of Municipal Code of City of Chicago, "Civilian Office of Police Accountability," Section 2-78-110.

42. Pursuant to Section 2-78–135, Defendant COPA strives to conclude its investigations of any alleged misconduct within six (6) months after its initiation and, if not, Defendant COPA must notify the employee named in the investigation for the reason of the delay. Section 2-78-135.

43. Defendant COPA's mission is to "[p]rovide a just and efficient means to fairly and timely conduct investigations within [its] jurisdiction; [d]etermine whether allegations of police misconduct are well-founded; [i]dentify and address patterns of police misconduct; and [m]ake policy recommendations to improve the Chicago Police Department, thereby reducing incidents of police misconduct." COPA, Vision & Mission, https://www.chicagocopa.org/about-copa/mission-history/ (retrieved on August 15, 2024).

44.  Under COPA's published Rules and Regulations, the mission of the Civilian Office of Police Accountability is "to conduct investigations within its jurisdiction with integrity, transparency, independence, and timeliness. The goal of every COPA investigation is to determine whether allegations of misconduct are well-founded, applying a preponderance of the evidence standard..." COPA Rules and Regulations, Section 1.2, "Mission."  Further, COPA "strives to conduct investigations with the highest level of integrity and independence in order to make findings based on a thorough review of the evidence and accurate legal analysis, without regard for political influence." Id.

45.  Additionally, also as set forth in the "Investigative Standards" section of COPA's published Rules and Regulations, COPA's (Section 3.2):

> ...goal is to gather the evidence and evaluate the facts without regard to personal beliefs or concern for personal, professional, or political consequences. When weighing the evidence, we will attach no greater value to a Department member's statement than that of a civilian. Although we must always be mindful of the reliability of information we receive, we will never disregard a witness statement merely because the witness has some connection to a complainant, a Department member, or any other person involved in the matter.
>
> COPA investigations will be assigned to investigative staff with the requisite knowledge, skill, training, and ability to conduct a thorough and timely investigation of the matter. COPA investigative staff will use due professional care and conform to the highest legal and ethical standards in the course of their work. COPA Supervisory and Legal staff will ensure that investigations are conducted in full compliance with the law and are thorough, and that Final Summary Reports are of the highest quality.
>
> COPA employees are expected to conduct their work objectively and without bias. COPA investigators are required to bring any potential conflict of interest (actual or perceived) to the attention of the Chief Administrator so that he or she may conduct a thorough assessment to determine what, if any, recusals are required to eliminate the conflict of interest and avoid the appearance of a conflict of interest between a COPA employee and COPA's mission to conduct investigations without bias.

46.     Defendant COPA's vision is to "…be the leader in police accountability by conducting through investigations, to advance the culture of policing and build trust in civilian oversight." COPA, Vision & Mission, https://www.chicagocopa.org/about-copa/mission-history/ (retrieved on August 15, 2024).

47.     Despite the Chicago Municipal Ordinance and COPA's Rules and Regulations to conduct all investigations in a fair and unbiased manner, Defendant COPA publicly states otherwise.  Specifically, Defendant COPA's major case specialist, Jessica Sanchez ("Major Case Specialist Sanchez"), stated in a COPA-produced video, titled, "COPA 5 Years in Review," "what I would like for the citizens of Chicago to know about COPA is that *we are advocates for them*…". (emphasis added).

48.     Despite the Chicago Municipal Ordinance and COPA's Rules and Regulations to conduct investigations in a fair and unbiased manner, Defendant Chief Administrator Kersten routinely publicly comments on pending COPA investigations. Such comments include, but are not limited to, describing material facts such as: the body worn or other camera footage; the actions taken by the Officer(s); and/or other events or evidence at issue in the investigation. By publicly commenting on such matters prior to COPA concluding its investigation and rendering its findings, Defendant Chief Administrator Kersten taints the investigation process and any results thereof.

49.     After finalizing an investigation, Defendant COPA uploads its Summary Report of Investigation ("SRI") on its official website under a tab titled "Case Portal." Once the SRI is successfully uploaded, it becomes accessible to the public.

50.     Then, Defendant COPA sends the investigative file, along with its findings and discipline recommendations to Defendant Superintendent.  Defendant Superintendents may submit the COPA investigation to Command Channel Review. The purpose of the Command Channel

Review process is to ensure consistency in investigations and recommended discipline for sustained findings regardless of the investigating entity, Officer's unit of assignment, or race of the complainant or the accused Officer. During this process, the accused Officer's supervisors review the investigatory file and provide a concurrence or non-concurrence for the Defendant Superintendents to consider.

51.     After Command Channel Review, Defendant COPA's disciplinary recommendations are presented to the Superintendent. The Superintendent can either accept or reject Defendant COPA's disciplinary recommendation. In accordance with Department General Order G08-01, the Superintendent is "charged with the responsibility and has the authority to maintain discipline within the Department."

52.     Further, the Superintendent must "ensure that [internal] investigations are conducted consistent with [Department rules, orders and/or the provisions] to provide Department members with the fundamental principles of fairness and to ensure that members are afforded all their rights. These rights also will be understood to mean the provisions of the applicable collective bargaining agreements between the City of Chicago, Department of Police, and Department members." CPD General Order G08-01.

53.     The Superintendent also "will ensure the review of recommendations for disciplinary action and will take such action as the Superintendent deems appropriate." CPD General Order G08-01.

54.     If the Superintendent accepts Defendant COPA's disciplinary recommendation, the discipline becomes final, and the accused officer must serve or challenge the discipline. If the Superintendent rejects Defendant COPA's disciplinary recommendation, both parties must present

their arguments to the Police Board and one member of the Board must make the final determination.

55.    Defendants have engaged in a pattern and practice to treat Police Officers unequally and unfairly. Specifically, Defendant COPA conducts unconstitutional, biased and untimely investigations. Defendant Chicago Police Department accepts the recommendations from such unconstitutional, biased and untimely investigations.

## IV.    ALLEGATIONS OF FACTS OF INDIVIDUAL PLAINTIFF OFFICERS

### A.    Investigation - Officer Joseph Cappello

56.    <u>Incident:</u> On December 6, 2019, the Department assigned Officer Cappello to a Tactical Team in the 11th District. As part of their duties, the Tactical Team surveilled an area near Homan and Ohio Avenues known to be an area with illegal drug transactions and a history of violent incidents. The Officers responded to fellow Officers' observations of individuals selling or soliciting the sale of illegal drugs whereupon the Officers placed Ashanti Williams under arrest and transported her to the 11th District. At the station, Officer Cappello conducted a protective pat down of Ms. Williams. While in the processing room, Officer Cappello felt from the outside of her pocket objects consistent with illegal narcotics. Thereafter, female Officers at the 11th District searched Ms. Williams and recovered two packets of heroin. Ms. Williams subsequently made a complaint against Officer Cappello.

57.    <u>Investigation:</u> Defendant COPA, based on its investigation, issued an SRI dated January 22, 2021 which accused Officer Cappello of conducting an improper search upon Ms. Williams and "placing his hands inside her pants and touching her pubic hair without justification." Defendant COPA recommended that Officer Cappello be suspended for 30 days. Defendants DCA Jackson and Chief Administrator Kersten approved the SRI. Superintendent Brown then relied

upon Defendant COPA's flawed investigation, which included salacious descriptions off the allegations, and increased the penalty to a 45 day suspension.

58. <u>Final Decision</u>: The Lodge submitted this matter pursuant to the CBA to final and binding arbitration. The Arbitrator found that Defendant COPA's conclusion could not be supported by reliable or persuasive evidence.

59. The Arbitrator also specifically criticized Defendant COPA and Superintendent Brown for their failure to address or weigh Ms. Williams' credibility. Additionally, the Arbitrator criticized Defendants COPA and Superintendent Brown for relying upon an alleged corroborating witness, also in the lockup at the time of the pat down, that did not match the physical description of the person held in the lockup when the incident occurred. Defendant COPA took no other steps to authenticate that the person that it allegedly interviewed was actually the person in the lockup. In fact, Defendant COPA obtained no sworn statement from this alleged witness, but rather relied solely on a summary prepared by the Defendant COPA investigator of the alleged interview.

60. Based upon the lack of any evidence to support the allegation, the Arbitrator rescinded the 45 day suspension[2] and further ordered the City, including all Departments and agencies thereof, to strike any and all references in its files of the conclusion that Officer Cappello engaged in the act of placing his hands inside Ashanti Williams' pants and/or touched her pubic hair. Despite this order from the Arbitrator, as of August 12, 2024, the SRI remained published on Defendant COPA's portal without correction or modification.

61. Defendants DCA Jackson, Chief Administrator Kersten and COPA intentionally ignored evidence and utilized unreliable evidence so it could achieve its result. Defendants DCA

---

[2] The Arbitrator did impose a 3 day suspension for grievant's failure to wait for a female Officer to be present prior to doing the protective pat down, which represented a penalty consistent with to what other Officers had received for the same offense.

Jackson, Chief Administrator Kersten and COPA intentionally deprived Officer Cappello of his due process.

62.     Defendant Chicago Police Department and Superintendent also intentionally deprived Officer Cappello of his due process when they upheld Defendant COPA's decision and thereafter increased the penalty.

63.     Defendants Chief Administrator Kersten and COPA intentionally and recklessly failed to remove the SRI from its website after receiving a notification of the arbitration decision or updating the SRI to include the Arbitrator's finding and notify the public that an Arbitrator ultimately found Officer Cappello not to have engaged in such misconduct.

**B.      Investigation – Officer Eric Duron**

64.     <u>Incident</u>: On October 9, 2018, Officer Duron worked as a Tactical Unit Officer with his partner. The Department assigned the Officers to perform general patrol duties in a high crime area known for gang, drug and gun violence. While driving northbound on Talman Avenue, Officer Duron observed two individuals in a dark alley walking westbound towards Washtenaw. Officer Duron then reversed his vehicle and entered the alley for further observation. Upon entering the alley, Officer Duron noticed one individual, later determined to be Matthew Aguilar, walking with his hands inside his sweatshirt appearing to be concealing something under his clothing.

65.     The Officers observed the second individual tucked away in a corner who appeared to be urinating. Accordingly, Officer Duron elected to perform an investigatory stop. As Aguilar approached the squad car, Officer Duron shined his flashlight at Aguilar and asked him to show his hands. Aguilar continued walking and once he passed the squad car, he ran off. Officer Duron's partner exited the squad car and chased Aguilar on foot. When it became safe to do so, Officer Duron reversed the squad car out of the alley and traveled down 47th Street in the direction of his

partner. Officer Duron then continued along 47th Street where he then observed Aguilar and the second individual running westbound on the sidewalk with the second individual a considerable distance ahead of Aguilar.

66.    Upon approaching the corner of 47th and Washtenaw, Aguilar turned northbound on the east side of Washtenaw. Officer Duron likewise turned northbound on Washtenaw and momentarily lost visual sight of Aguilar. Immediately thereafter, Officer Duron heard a loud noise on the side of the squad car. Officer Duron then stopped, exited his vehicle and saw Aguilar laying on the ground in a prone position behind the squad car.  Officer Duran contacted an ambulance and rendered aid to Aguilar.

67.    Surveillance video from a nearby apartment complex captured that Aguilar attempted to run from the east to the west side of Washtenaw and instead collided into the side of the patrol car and got pulled underneath. Medical personnel at Mount Sinai Hospital treated Aguilar for the sustained injuries.

68.    The Chicago Police Department's Major Accident Investigation Unit ("MAIU") retrieved video footage capturing the incident. After conducting a separate investigation from Defendant COPA's investigation, the MAIU concluded that when Aguilar ran northbound on Washtenaw Avenue, a poorly lit area, Aguilar ran into Officer Duron's vehicle while Officer Duron was driving. The MAIU emphasized that Officer Duron's actions did not cause Aguilar's injuries, but Aguilar's own actions caused his injuries. The MAIU forwarded its report ("MAIU Report") to Defendant COPA in May 2019.

69.    <u>Investigation</u>: Despite initiating the investigation on the same day the incident occurred on October 9, 2018, Defendant COPA did not interview Officer Duron until March 2019.

Additionally, despite receiving the MAIU Report in May 2019, Defendant COPA did not finalize the investigation until November 25, 2022.

70.     Defendant COPA alleged that Officer Duron failed to activate his body worn camera ("BWC") and carelessly operated Defendant's Chicago Police Department's vehicle. Ignoring the MAIU Report, Defendant COPA sustained the allegations. Defendants DCA Hearts-Glass and Chief Administrator Kersten approved the final investigatory findings. After finalizing the investigation, Defendant COPA uploaded its SRI onto its website, where it currently remains.

71.     <u>Final Decision</u>: Also ignoring the MAIU Report, Defendant Chicago Police Department and Superintendent Brown upheld Defendant COPA's investigatory conclusions. Similar to Defendant COPA, Defendant Chicago Police Department and Superintendent Brown did not provide an explanation as to why they did not consider the MAIU Report when making the final decision.

72.     The Lodge submitted this matter pursuant to the CBA to final and binding arbitration. In his ruling, the Arbitrator noted his concern that Defendant COPA ignored the MAIU Report without any explanation. The Arbitrator further opined that a 10-day suspension for an unintentional BWC violation exceeds the disciplinary range for this offense, which, typically, is a reprimand to a 1-day suspension. Accordingly, the Arbitrator noted that because of the absence of explanation to ignore the MAIU report, Defendant Chicago Police Department did not have just cause to suspend Officer Duron and rescinded the 10-day suspension for the careless driving accusation and reduced the 10-day suspension to a reprimand for the BWC violation.

73.     Defendants DCA Hearts-Glass, Chief Administrator Kersten and COPA intentionally ignored the MAIU Report and replaced it with its own unsupported and speculative theories about what occurred so that it could achieve its investigatory result, and Defendant COPA

took four (4) years to finalize the investigation. Defendants DCA Hearts-Glass and COPA intentionally deprived Officer Duron of his due process rights.

74.     Defendant Chicago Police Department and Superintendent Brown also intentionally deprived Officer Duron of his due process rights when it also ignored the MAIU Report and upheld Defendant COPA's decision.

75.     Defendant COPA intentionally and recklessly failed either to remove the SRI from its website after receiving notification of the arbitration decision, and/or failed to update the SRI to include the arbitration finding to notify the public that an Arbitrator ultimately found Officer Duron not to have operated the vehicle carelessly.

76.     Plaintiff Lodge expended resources on attorneys' fees and arbitration costs as a result of Defendants DCA Hearts-Glass, Chief Administrator Kersten and COPA's meritless investigation and the Department's subsequent discipline.

### C.     Investigation - Officer Vincent Barner

77.     <u>Incident:</u> In August 2017, Officer Barner filed for divorce from his wife, with whom he has two children. One year later, in August 2018, the divorce proceedings remained ongoing. As part of those proceedings, Officer Barner and his wife agreed to take turns residing at their residence in order to care for their children. On August 16, 2018, his wife claimed that at some point after Officer Barner arrived at the residence, an argument ensued between her and Officer Barner. Their daughter, home at the time, was participating in a conference call tutoring session. The tutor, in an unsworn, unrecorded statement with Defendant COPA, purportedly confirmed that she heard an argument between Officer Barner and his wife, but did not hear any specific verbal threats being made. During her COPA interview, his wife explained that Officer Barner stated "I don't care about the job. If you want, you can continue to call the police on me. I'll just retire. You

are gonna make me do something I don't want to do." During her COPA interview, his wife confirmed that Officer Barner did not touch or otherwise harm her during the alleged argument.

78.     <u>Investigation</u>: Despite initiating the investigation on the same day the incident occurred on August 16, 2018, Defendant COPA did not finalize the investigation until January 2020. Defendant COPA alleged that Officer Barner made verbal threats of bodily harm to his wife, sustained the allegations, and recommended that Officer Barner be suspended for ten (10) days and attend anger management services. Defendants DCA Jackson and Chief Administrator Kersten approved the final investigatory findings. After finalizing the investigation, Defendant COPA uploaded its SRI onto its website, where it currently remains.

79.     In its SRI, Defendant COPA intentionally changed the testimony of what Officer Barner's wife told Defendant COPA. More specifically, Defendant COPA sustained findings that Officer Barner "made verbal threats of bodily harm to [his wife] stating words to the effect: "I don't care about the job. You are going to make me do something ***to you***" (emphasis added).  At no point during Ms. Barner's interview with Defendant COPA did she ever attribute those words to Officer Barner. Rather, during her interview with Defendant COPA, She simply stated that Officer Barner said, "I don't care about the job. If you want, you can continue to call the police on me. I'll just retire. You are gonna make me do something I don't want to do."

80.     The fact that Defendant COPA had to change the statement to include the words "to you" confirms that it had no evidence of any "threats of bodily harm" made by Officer Barner. Instead, it highlights Defendant COPA's unlawful practice of fabricating facts to support its findings.

81. <u>Final Decision</u>: Despite the fact that Defendant COPA altered Officer Barner's wife's testimony to sustain the allegations, Defendant Chicago Police Department and the then-Superintendent upheld Defendant COPA's investigatory conclusions.

82. Defendant Chicago Police Department and the then-Superintendent received Defendant COPA's finalized investigation on February 26, 2020. However, Defendant Chicago Police Department and the then-Superintendent did not serve Officer Barner with the 10-day suspension until two years later -- March 29, 2022.

83. The Lodge submitted this matter pursuant to the CBA to final and binding arbitration. During the arbitration hearing, the Arbitrator noted that Officer Barner did not say what Defendant COPA accused him of saying. More specifically, the Arbitrator explained, in his written award, that Defendant COPA changed the original statement from, "I don't care about the job. If you want, you can continue to call the police on me. I'll just retire. You are gonna make me ***<u>do something I don't want to do</u>***," to "I don't care about the job… You are going to make me ***<u>do something to you</u>***." (emphasis added). The Arbitrator also stated that punishing Officer Barner in 2022 for a conversation he had with his estranged wife in 2018 would not serve Defendant Chicago Police Department's purpose of discipline, which is to correct Officers' behavior and not to punish their behavior. Accordingly, the Arbitrator held that Defendant Chicago Police Department did not have just cause to suspend Officer Barner and rescinded the 10-day suspension.

84. Defendant COPA intentionally fabricated Officer Barner's wife's statement so that it could achieve its investigatory result and took two years to finalize the investigation without any reason to support its delay. Defendants DCA Jackson, Chief Administrator Kersten and COPA intentionally deprived Officer Barner of his due process rights. Defendants Chicago Police Department and then-Superintendent also intentionally deprived Officer Barner of his due process

rights when they upheld Defendant COPA's decision and took an additional two years to serve him with the 10-day suspension.

85. Defendants Chief Administrator Kersten and COPA intentionally and recklessly failed either to remove the SRI from its website after receiving notification of the arbitration decision, and/or failed to update the SRI to include the arbitration finding to notify the public that an Arbitrator ultimately found Officer Barner not to have made a threatening statement to his estranged wife.

86. Plaintiff Lodge expended resources on attorneys' fees and arbitration costs as a result of Defendants DCA Jackson, Chief Administrator Kersten and COPA's meritless investigation and Defendant Department's subsequent discipline.

### D. Investigation - Officer Terrance Nalls

87. <u>Incident</u>: On December 19, 2015, Officer Nalls received a call from Kohl's security that his son had been detained for stealing merchandise from the store. Kohl's security informed Officer Nalls that his son would only be released from their custody if a parent or guardian came to the store to get him. Upset with the news of his son stealing, Officer Nalls drove to Kohl's. When Officer Nalls arrived, he briefly spoke to Kohl's security and then left the store with his son. In the Kohl's parking lot, Officer Nalls physically disciplined his son. Kohl's security cameras captured the incident. After discovering that Officer Nalls physically disciplined his son in the parking lot, Kohl's security called the Police Department on Officer Nalls. The responding Officers arrested Officer Nalls, as a result of this incident.

88. <u>Investigation</u>: In late-2015, Defendant COPA initiated an investigation against Officer Nalls regarding the incident and alleged that Officer Nalls brought discredit upon Defendant Chicago Police Department when he disciplined his son and subsequently arrested him

22

for doing so. Defendant COPA interviewed Officer Nalls on May 19, 2017, more than two years after the incident occurred. On August 15, 2018, Defendant COPA finalized the investigation by sustaining the allegations and recommending Officer Nalls be suspended for 20 days. Defendant Chief Administrator Kersten approved the final investigatory findings. After finalizing the investigation, Defendant COPA uploaded its SRI onto its website.

89.     Final Decision: Defendant Chicago Police Department and a former Superintendent upheld Defendant COPA's recommendation and served Officer Nalls on April 12, 2023, over eight (8) years after the incident and five (5) years after Defendant COPA finalized the investigation. Neither Defendant COPA nor Defendant Chicago Police Department provided any explanation for their delays.

90.     The Lodge submitted this matter pursuant to the CBA to final and binding arbitration. The Arbitrator concluded that due to the significant investigational delay and a lack of explanation for such delay, Defendant Chicago Police Department failed to prove that it had just cause to suspend Officer Nalls for 20 days and rescinded the suspension in its entirety.

91.     Defendants Chief Administrator Kersten, COPA and Chicago Police Department took eight (8) years, without justification, to finalize the investigation and suspend Officer Nalls. Defendants intentionally deprived Officer Nalls of his due process rights.

92.     Defendants Chief Administrator Kersten and COPA intentionally and recklessly failed to either remove the SRI from its website after receiving notification of the arbitration decision, and/or update the SRI to include the arbitration finding.

93.     Plaintiff Lodge expended resources on attorneys' fees and arbitration costs as a result of defending Officer Nalls against Defendants Chief Administrator Kersten and COPA's

meritless findings and investigation and Defendant Chicago Police Department's excessive suspension.

**E.      Investigation – Officer George Spacek**

94.      <u>Incident</u>: On February 24, 2021, multiple Officers conducted a traffic stop. During the traffic stop, the driver, Troy Gaston, did not comply with the Officers' orders and he acted irate. When Officer Spacek arrived at the scene of the traffic stop, he assumed the role of an additional guard officer. When Officer Spacek observed Gatson being uncooperative with the other Officers and attempted to close his car door potentially to flee, Officer Spacek opened Gaston's rear passenger's side door to prevent Gaston from possibly driving away. In response, Gaston attempted to stop Officer Spacek from opening the door. After opening the door, Officer Spacek noticed a bag on the backseat of Gaston's vehicle, grabbed it, since he had concerns the bag might contain a weapon.  Officer Spacek then removed the bag from the vehicle, but did not search the bag. Gaston became more irate, exited the vehicle, and advanced towards Officer Spacek, making chest to chest contact in an attempt to retrieve the bag.

95.      <u>Investigation</u>: Defendant COPA initiated an investigation against Officer Spacek, and ultimately concluded that Officer Spacek searched the individual's vehicle and seized the individual's bag without justification. During the interview with Defendant COPA, Officer Spacek explained that he searched the vehicle and seized the bag to maintain officer safety. Officer Spacek also explained that he feared for his and the other Officers' safety due to Gaston's erratic behavior. In addition, Officer Spacek explained that Gaston was not handcuffed and potentially could have fled in his vehicle.

96.      Defendant COPA ignored Officer Spacek's statement and the supporting BWCs footage that corroborated Officer Spacek's statement. Instead Defendant COPA sustained the

allegation and recommended that Officer Spacek be suspended for 20 days. The SRI also included findings which the Investigator fabricated and which contradicted the actual evidence ascertained during the Investigation. The investigation took nearly two years to complete. Defendants DCA Jackson and Chief Administrator Kersten approved the SRI.

97.     Final Decision: Defendant Chicago Police Department and Superintendent Carter upheld Defendant COPA's recommendation.

98.     Defendants DCA Jackson, Chief Administrator Kersten and COPA ignored evidence in the file that would have supported not sustaining the allegation. Defendants DCA Jackson, Chief Administrator Kersten and COPA intentionally deprived Officer Spacek of his due process rights. Defendants DCA Jackson, Chief Administrator Kersten and COPA's delay in conducting and concluding the investigation also further deprived Officer Spacek of his due process rights. Defendant Chicago Police Department and Superintendent Carter also intentionally deprived Officer Spacek of his due process rights when it upheld Defendant COPA's decision.

99.     Plaintiff Lodge expended resources on attorneys' fees and arbitration costs as a result of defending Officer Spacek against Defendants DCA Jackson, Chief Administrator Kersten and COPA's meritless findings and investigation and Defendants Chicago Police Department and City of Chicago's excessive suspension.

    F.    **Investigation – Officer Dimar Vasquez**

100.     Incident: On April 25, 2018, the Department assigned Officer Vasquez to the Tactical Unit. At the time of the incident, Officer Vasquez had his BWC for, at most, six months. Officer Vasquez stood outside of the District station, he received a 10-1 call which is a high priority notification of an officer in distress. The situation that gave rise to the 10-1 call resulted from a domestic incident involving Latanya Thorpe and her boyfriend, Forrest Dix. After getting into a

physical dispute with Mr. Dix, Ms. Thorpe flagged down a passing unmarked police vehicle with two Officers inside. Ms. Thorpe led the Officers to Forrest Dix's apartment where he opened the door and hit one of the Officers on the head with a glass bottle several times. Due to Forrest Dix's attack on the Officer, another Officer placed the 10-1 call. In response to the 10-1 call, Officers Vasquez and his partner, entered their vehicle and traveled to the location of the call.

101.    Upon the Officers arrival at the location of the 10-1 call, Officer Vasquez activated his BWC. At the scene, another Police Officer informed Officer Vasquez that Forrest Dix went to his mother's house. Once Officer Vasquez arrived at the Offender's mother's residence, Officer Vasquez retrieved his authorized carbine rifle from his vehicle.

102.    In response to knocking, Trayvon Dix, Forrest Dix's brother, opened the door and aggressively approached an Officer. Then, Officer Vasquez walked up the stairs and briefly pointed his carbine rifle at Trayvon Dix. Officer Vasquez pointed his carbine rifle at Trayvon, with his finger on the pistol grip and not on the trigger. Additionally, Officer Vasquez had the safety lock engaged which would prevent the weapon from firing. Officer Vasquez told Trayvon, "Let me see your hands," to which Trayvon complied. Officer Vasquez conducted a threat assessment and immediately lowered his weapon. This interaction only lasted approximately two (2) seconds.

103.    <u>Investigation</u>: The incident occurred on April 25, 2018. Defendant COPA did not initiate the investigation until one (1) year after the incident, when Forest Dix filed a civil lawsuit against the City. Defendant COPA first interviewed Officer Vasquez on November 4, 2020, two (2) years after the incident. Based on an allegation made by Trayvon Dix on January 12, 2021, Defendant COPA interviewed Officer Vasquez a second time on February 26, 2021, nearly three (3) years after the incident. Defendant COPA finalized the SRI on December 28, 2021, well over three (3) years after the incident.

104.     Defendant COPA alleged that Officer Vasquez violated Department policy when he pointed a rifle at or in the direction of Treyvon Dix, sustained the allegation, and recommended that he be suspended for 365 days.[3] Defendants DI Hreno, DCA Haynam and Chief Administrator Kersten approved the final investigatory findings.

105.     During the investigation, Defendants DI Hreno, Chief Administrator Kersten, DCA Haynam and COPA relied on an inapplicable Defendant Chicago Police Department policy and ignored the actual applicable policy. More specifically, Defendants DI Hreno, DCA Haynam and Chief Administrator Kersten and COPA applied G03-02-03 which governs an Officer's discharge of a firearm. However, in Officer Vasquez's case, he did not discharge his firearm.

106.     Defendants DI Hreno, DCA Haynam and Chief Administrator Kersten and COPA did not apply Chicago Police Department Order U04-02-05, which governs an Officer's use of a carbine weapon.  Defendant COPA intentionally ignored the fact that Officer Vasquez complied with that order and sustained the allegation. After finalizing the investigation, Defendant COPA uploaded its SRI onto its website, where it currently remains.

107.     <u>Final Decision</u>: Despite the fact that Defendant COPA applied the incorrect policy to sustain the allegation, Defendant Chicago Police Department and Superintendent Brown upheld Defendant COPA's investigatory conclusions. Defendants Chicago Police Department and Superintendent Brown did not serve Officer Vasquez with the 365-day suspension until November 16, 2022. As a result of Defendants COPA, Chicago Police Department, and Superintendent Brown's delay, the Department notified Officer Vasquez that he would be suspended for the 2018 incident four and a half (4 ½ ) years after the incident occurred.

---

[3] COPA also alleged that Officer Vasquez detained Trayvon Dix without justification and failed to activate his BWC. However, for the purposes of the instant lawsuit, Plaintiffs focus solely on the rifle pointing allegation.

108.     Defendants DI Hreno, DCA Haynam and Chief Administrator Kersten and COPA intentionally applied the incorrect policy so that it could achieve its investigatory result and took three years to finalize the investigation without any reason to support its delay. Defendants DI Hreno, DCA Haynam and Chief Administrator Kersten and COPA intentionally deprived Officer Vasquez of his due process rights.

109.     Defendants Chicago Police Department and then-Superintendent also intentionally deprived Officer Vasquez of his due process rights when it upheld Defendant COPA's decision and took a year to serve him with the 365-day suspension.

110.     Plaintiff Lodge expended resources on attorneys' fees and arbitration costs as a result of Defendants DI Hreno, DCA Haynam and Chief Administrator Kersten and COPA's meritless investigation and the Department's improper discipline.

**G.     Investigation - Officer Jaime Acosta**

111.     <u>Incidents</u>: On March 5, 2020 Officer Acosta's former wife called 911 to report a custody dispute regarding at whose house their son should sleep that night. When the police arrived, Officer Acosta's former spouse requested that her complaint be documented for divorce court purposes. The Officer's former spouse also complained that he threw water at her. The Officers did not find evidence to support the allegation that Officer Acosta threw water on his wife. On March 7, 2020, Officer Acosta's former spouse called 911 again to report that Officer Acosta had entered their house without permission. Officer Acosta's former spouse did not press charges but did request that the Officers document her accusations for divorce court purposes.

112.     <u>Investigation</u>: On or about March 7, 2020, Defendant COPA initiated an investigation into Officer Acosta's former wife's accusations that Officer Acosta violated an Agreed Custody Order and illegally entered the house in which she resided. Officer Acosta's

former wife did not cooperate with Defendant COPA in its investigation. Accordingly, COPA obtained an affidavit override to continue to investigate the former spouse's accusations. During his statement to Defendant COPA, Officer Acosta told Defendant COPA that on the night of March 7, 2020, he knew his former wife was not home and that he solely owned the house at issue. He further stated that pursuant to the Agreed Custody Order, he had a key to the house and the code to the security system. He explained he did not violate the Agreed Custody Order on March 5, 2020 when he kept his son at his house or when he went to his house the night of March 7, 2020 at a time when his spouse was not home. Defendant COPA found Officer Acosta's explanation for his actions related to his child and presence at his home to be less credible than his former wife's statements recorded on the BWC footage and the audio of her 911 call.

113.    At no point was Officer Acosta found to have violated the Agreed Custody Order by the Divorce Court, yet Defendant COPA concluded that Officer Acosta violated an Agreed Custody Order in the Acosta's divorce proceeding. Defendant COPA recommended that Officer Acosta be suspended for 180 days up to termination for its opinion that he violated the Agreed Custody Order. Defendants DCA Jackson,  DCA Haynam, and Chief Administrator Kersten approved the investigation findings. After finalizing the investigation, Defendant COPA uploaded its Summary Report of Investigation onto its website.

114.    <u>Final Decision</u>: After receiving notification that Defendant COPA finalized the investigation, Superintendent Brown increased the recommended suspension from 180 days to 365 days. The then-Superintendent provided no explanation for the decision to impose this penalty on Officer Acosta. The Lodge submitted this matter pursuant to the CBA to final and binding arbitration. Although the Arbitrator conducted a full evidentiary hearing, the parties are still awaiting a decision on whether the City disciplined Officer Acosta for just cause.

115.    Defendant COPA's determination that Officer Acosta violated an Agreed Custody Order resulting in the recommendation of significant discipline remains on its website.

116.    Plaintiff Lodge expended resources on attorneys' fees and arbitration costs as a result of defending Officer Acosta against Defendants  DCA Jackson, DCA Haynam, Chief Administrator Kersten and COPA's meritless findings and investigation and Defendant Chicago Police Department's excessive suspension.

**H.    Investigation - Officer Lukasz Gorski**

117.    <u>Incident</u>: On June 8, 2018, Officer Gorski and two partners engaged in a pursuit of an individual with an outstanding warrant and considered armed and dangerous. Officer Gorski pursued the offender into a parking lot in which he thought the offender would be cornered.  The offender exited out of a rear exit not previously known to Officer Gorski and sped off. Officer Gorski turned out of the parking lot in the direction the offender exited the parking lot but soon lost sight of him.  As Officer Gorski terminated the pursuit and began to pull over to the side of the road, one of his partner's noted smoke up ahead. Officer Gorski continued to the location of the smoke and found the offender had crashed a stolen vehicle killing both himself and a passenger in his car and injuring three civilians. The Chicago Police Department conducted a traffic pursuit investigation and concluded that the pursuit was compliant with Department policy and procedure.

118.    <u>Investigation</u>: Defendant COPA initiated an investigation of the pursuit. Defendant COPA ignored the Department's conclusion that the pursuit was compliant with Department directives. Instead, Defendant COPA relied on information not known to the Officers during the pursuit and found that Officer Gorski should not have pursued the offender because he was only guilty of traffic offenses. Although the information provided to the Officers on the Chicago Police Department computers on the offender included a reference to attempted murder and that he was

armed and dangerous, Defendant COPA found the Officers should have obtained additional information before pursuing the Offender. Defendant COPA recommended that Officer Gorski be suspended 180-days to separation for the pursuit in this case. After finalizing the investigation, Defendant COPA uploaded its SRI onto its website. Defendants DI Hreno, DCA Hearts-Glass and Chief Administrator Kersten approved the SRI.

119.    Final Decision: Superintendent Brown concurred with Defendant COPA on its finding that Officer Gorski violated Department directives when he initiated and continued a traffic pursuit and recommended a suspension of 180 days. After conducting a full evidentiary hearing, the Arbitrator concluded that Defendant, Chicago Police Department, failed to prove that Officer Gorski violated Department directives when he initiated and continued a traffic pursuit.

120.    Because Defendants Chief Administrator Kersten and COPA intentionally and recklessly failed to either remove the SRI from its website after receiving notification of the arbitration decision and/or failed to update the SRI to include the arbitration finding.

121.    Plaintiff Lodge expended resources on attorneys' fees and arbitration costs as a result of defending Officer Gorski against Defendants DI Hreno, DCA Hearts-Glass and Chief Administrator Kersten meritless findings and investigation and Defendants Chicago Police Department and City of Chicago's excessive suspension.

## V.    COMMON TO ALL PLAINTIFF OFFICERS

122.    Upon information and belief, the Lodge asserts that there are other police officers within the bargaining unit represented by the Lodge for which Defendant COPA recommended discipline based upon an investigation in which Defendant COPA engaged in unconstitutional acts similar to those identified herein for the Plaintiff Officers. Upon information and belief, Defendants Chief Administrator Kersten, DCA Haynam, DCA Hearts-Glass, DCA Jackson and/or

DI Hreno approved the final reports in those cases. Upon information and belief, Defendants Chicago Police Department and Superintendent imposed discipline based upon such final reports. Upon information and belief, the Lodge expended resources on attorneys' fees and arbitration costs as a result of Defendants Chief Administrator Kersten, DCA Haynam, DCA Hearts-Glass, DCA Jackson, DI Hreno and/or Defendant COPA's meritless investigation and the Department's subsequent discipline.

123. While an Officer is under investigation, certain benefits and privileges are not available, such benefits may include, but are not limited to, overtime opportunities, assignments, and/or special details.

124. Once Defendant COPA posts its SRI on its portal, the public immediately has full access.

## VI. COUNT I: EQUAL PROTECTION AND DUE PROCESS 42 U.S.C. § 1983 (Against all Defendants)

125. Plaintiffs incorporate by reference Paragraphs _____ to _____ of this Complaint as fully set forth herein.

126. The actions of Defendants as set forth above constitute a violation of 42 U.S.C. §1983.

127. Defendants have a duty to investigate allegations of misconduct against Chicago Police Officers timely, fairly and in an unbiased manner.

128. Plaintiff Officers have protectable interests and reasonable expectations that Defendants would timely and fairly investigate allegations presented against Plaintiff Officers in an unbiased manner and that Defendants would impose fair and consistent discipline, if necessary.

129.    Defendants, under color of state law, engaged in patterns and practices of conducting unconstitutional investigations into Plaintiff Officers in ways that would support their investigatory result.

130.    Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendants on Count I and that the Court:

a)  Declare that Defendants' conduct was in violation of their rights under the United States Constitution;

b) Award Plaintiffs the value of any compensation and benefits lost as a result of Defendants' unlawful conduct;

c) Award Plaintiffs damages for emotional distress and compensatory damages;

d) Award Plaintiffs punitive damages;

e) Award Plaintiffs reasonable attorney's fees, costs and disbursements;

f) Enjoin Defendants its agents, successors, officers, employees and attorneys and those acting in concert with it, from engaging in the unlawful practices, policies, customs and usages as set forth herein and from continuing any and all other practices shown to be in violation of applicable law;

g) Award Plaintiffs any and all other relief as the Court deems just in the premises.

## VII.   COUNT II: 42 U.S.C. § 1983 – MONELL LIABILITY
##         (AGAINST DEFENDANT CITY OF CHICAGO)

131.   As against Defendant City of Chicago, Plaintiffs incorporate by reference Paragraphs _____ to _____ of this Complaint as fully set forth herein.

132.   The actions of Defendants Chief Administrator Kersten, DCA Jackson, DCA Haynam, DI Hreno and DCA Hearts-Glass, Defendant Superintendent, and the City of Chicago Police Department were done pursuant to one or more of the following <u>de facto</u> policies, practices, and/or customs of the City of Chicago that are so pervasive that they carry the force of law.

133.   Specifically, the City of Chicago has a *de facto* policy, practice and/or custom of fabricating and/or improperly sustaining allegations of Officer misconduct (both on duty and/or off duty misconduct), including the use of unlawful force. The fabrication and/or improper sustaining of allegations of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct; failure to promptly record witness statements or preserve evidence; failure to promptly interview the suspected Officer; recommending excessive discipline of Officers where the complaint is sustained; fabrication of evidence to sustain allegations; disregarding or concealing of exculpatory evidence which exonerates the Officer; ignoring or dismissing of evidence which discredits testimony of complainant or witnesses to sustain allegations.

134.   Individually and collectively, the above described *de facto* policies, practices, and/or customs of the City proximately result in the culture and endemic attitude among members of the Defendant City of Chicago, including Defendants Chief Administrator Andrea Kersten, DCA Sharday Jackson, DCA Matthew Haynam, DCA Angela Hearts-Glass, DI Stephanie Hreno, former Superintendents, Chicago Police Department, that they may engage in misconduct against the citizenry, including Police Officers, with impunity and without fear of official consequence.

135.   The aforementioned *de facto* policies, practices, and/or customs of the City, are the direct and proximate cause of the injuries sustained by the Plaintiffs. These same *de facto* policies, practices, and/or customs have been maintained and/or implemented with utter indifference and have encouraged and/or motivated Defendants' unlawful acts.

136.   The above acts or omissions of the City violated Plaintiffs' rights under the Fourteenth Amendment to the United States Constitution.

137.   As a result of the City's policies, practices, and/or customs,  the Plaintiffs have suffered pain and injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendant on Count II and that the Court:

a)   Declare that Defendant City of Chicago's conduct was in violation of their rights under the United States Constitution;

b)   Award Plaintiffs the value of the compensation and benefits lost as a result of Defendant's unlawful conduct;

c)   Award Plaintiffs damages for emotional distress and compensatory damages;

d)   Award Plaintiffs punitive damages;

e)   Award Plaintiffs reasonable attorney's fees, costs and disbursements;

f)   Enjoin Defendant, its agents, successors, officers, employees and attorneys and those acting in concert with it, from engaging in the unlawful practices, policies, customs and usages as set forth herein and from continuing any and all other practices shown to be in violation of applicable law;

g)   Award Plaintiffs any and all other relief as the Court deems just in the premises.

## VIII.   COUNT III:  VIOLATIONS OF COMMON LAW FALSE LIGHT
## (Against Defendants Kersten, COPA, City of Chicago, and Chicago Police Department)

138.    Plaintiffs incorporate by reference Paragraphs _____ to _____ of this Complaint as fully set forth herein.

139.    The actions of Defendants as set forth above constitute a violation of Illinois Common Law False Light.

140.    Defendants Chief Administrator Kersten, COPA, City of Chicago, and Chicago Police Department have a duty to ensure that information published concerning City employees is an accurate and correct portrayal of disciple taken against the employees.

141.    Defendants City of Chicago and Chicago Police Department are provided copies of arbitration awards, including awards related to the Plaintiff Officers herein, in which the Arbitrator announced the final and binding decisions on discipline.

142.    Upon information and belief, Defendants City of Chicago and/or Chicago Police Department provides Defendant COPA with copies of such arbitration awards.

143.    Defendant COPA has a duty to present accurate information regarding the final result of Defendant COPA's investigations, which includes whether their investigatory conclusions were ultimately upheld in arbitration proceedings.

144.    Plaintiffs have protectable interests and reasonable expectations that Defendants City of Chicago and COPA would only include information on their official website that is an accurate description of the conduct and the final discipline imposed on the Officers.

145.    Defendant COPA intentionally and recklessly leads the public to believe Plaintiff Officers committed highly offensive misconduct despite arbitration decisions holding that Defendants did not prove that such misconduct occurred.

146.    Upon information and belief, Defendants City of Chicago and Chicago Police Department are aware of Defendant COPA's continued publication of inaccurate information.

147.    Individual Named Plaintiff Officers have suffered embarrassment, shame, loss of reputation, mental and physical distress and other injuries as a result of Defendants' actions.

148.    Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendants on Count III and that the Court:

a) Award Plaintiffs the value of the compensation and benefits lost as a result of Defendants' unlawful conduct;

b) Award Plaintiffs damages for emotional distress and compensatory damages;

c) Award Plaintiffs punitive damages;

d) Award Plaintiffs reasonable attorney's fees, costs and disbursements;

e) Enjoin Defendants its agents, successors, officers, employees and attorneys and those acting in concert with it, from engaging in the unlawful practices, policies, customs and usages as set forth herein and from continuing any and all other practices shown to be in violation of applicable law;

f) Award Plaintiffs any and all other relief as the Court deems just in the premises.


/s/   Pasquale A. Fioretto

Pasquale A. Fioretto
Catherine M. Chapman
Brian C. Hlavin
Laura M. Finnegan
Destiny A. Collins
Carson W. Fallo
Attorneys for the Plaintiffs
BAUM SIGMAN AUERBACH & NEUMAN, LTD.
200 West Adams Street, Suite 1825
Chicago, IL  60606-5250
Telephone: (312) 216-2566;Facsimile: (312) 236-0241
E-Mails:     pfioretto@baumsigman.com; bhlavin@baumsigman.com;
             cchapman@baumsigman.com;lmfinnegan@baumsigman.com;
             dcollins@baumsigman.com; cfallo@baumsigman.com
I:\FOP\COPA\§1983 Litigation\complaint 08-16-24 paf dac kp (FINAL).docx